IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-CR-62 |
| | ) | (PHILLIPS/SHIRLEY) |
| BRYAN CORNIELIUS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court, as may be appropriate. The Defendant is charged in a one-count Indictment [Doc. 1], which contends that, having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, the Defendant did knowingly possess a firearm in violation of 18 U.S.C. § 922(g)(1).

The Defendant has filed a "Motion to Suppress the Stop and Seizure," wherein the Defendant asks that "the search of his car be determined unreasonable and the items seized [be] suppressed from use in this case." The only item which the Defendant has identified as being the subject of this motion is the firearm that was found during the search of his car, which he is charged with possessing in violation of 18 U.S.C. § 922(g)(1).

The parties appeared before the Court for a motion hearing on June 28, 2011. Assistant United States Attorney Zachary Bolitho ("AUSA Bolitho") was present representing the

Government. Attorney Phillip Lomonaco ("Attorney Lomonaco") represented the Defendant, who was also present. The Court heard the evidence presented and the arguments of the parties on the motion.

The Court finds that the Defendant's motion is now ripe for adjudication, and for the reasons stated below, the Court will **RECOMMEND** that the motion be **DENIED**.

I.  POSITIONS OF THE PARTIES

The Defendant's vehicle, a Ford Crown Victoria, was stopped by Knoxville Police Department Officer Stephanie Wilson on the night of January 28, 2011. A drug dog alerted on the vehicle, and a search of the vehicle yielded the firearm that the Defendant is charged with possessing in this case. The Defendant maintains that Officer Wilson did not have probable cause or reasonable suspicion to stop his vehicle. Specifically, the Defendant argues that a tip called in to 911 did not provide probable cause or reasonable suspicion for stopping the vehicle, and he also argues that Officer Wilson did not have probable cause or reasonable suspicion to believe that he committed a traffic violation and stop him on that basis.

The Government responds that Officer Wilson fully complied with the Fourth Amendment of the United States Constitution when she stopped Defendant's vehicle. The Government argues that Officer Wilson lawfully stopped Defendant's vehicle because she had reasonable suspicion to believe its occupants had just finished dealing drugs in the Valley Oaks Apartments' parking lot. The Government also contends that Officer Wilson's stop was lawful because she had probable cause and reasonable suspicion to believe that the Defendant violated state law by turning left without signaling.

## II. TESTIMONY AND EVIDENCE

The evidence submitted at the hearing included: a recording of the 911 call from the informant, the testimony of Officer Stephanie Wilson, and a video recording from Officer Wilson's cruiser. The Court found each of these sources of evidence to be reliable, and specifically, the Court found Officer Wilson's testimony to be credible. The Court finds that the facts of this matter are captured in the summary of the evidence below, but where necessary, the Court will include specific findings of fact in its analysis of the issues presented.

### A. The 911 Call

In the recording of the call to 911,[1] the dispatcher answers the call and identifies herself. The caller responds, "This is Tom over here at Valley Oak Apartments on Valley View." He says, "I talked to KCDC, and they told me anytime I see this Ford Crown Vic' pull back in here for me to call you guys." The dispatcher confirms that the caller is calling from Valley Oak Apartments on Oak Branch Circle. The caller confirms that the persons suspected of doing drugs are in a green Ford Crown Victoria. He adds, "They said whenever I see him pull in here for me to call you guys; he's out there doing drugs again." The dispatcher asks if the vehicle is a truck, and the caller says, "No, it's a Crown Victoria, green." The dispatcher asks, "And it's outside doing drugs," and the caller responds, "Yeah." The dispatcher asks, "Or dealing drugs," and the caller responds, "Yes."

The dispatcher asks if the caller wants to leave his telephone number, which he does. The Dispatcher states that she will put the call into dispatch, and the caller remarks, "You might want to tell them to hurry and get out here. Last time they came out here, they missed them by five

---

[1]The Court admitted **Exhibit 1**, a compact disc containing the audio recording of the call to 911, into evidence, and AUSA Bolitho played a portion of this recording prior to Officer Wilson beginning her testimony.

minutes. He's parked right out front." The dispatcher thanks the caller for the information.

**B.     Testimony of Officer Stephanie Wilson**

The Government presented a single witness at the hearing: Knoxville Police Department Officer Stephanie Wilson. Officer Wilson began her testimony by explaining that she had worked in law enforcement for eleven years, and she had worked in both Clinton, Tennessee, and White House, Tennessee. She is a patrol officer with the Knoxville Police Department.

Officer Wilson confirmed that she was on patrol on January 28, 2011, and she received a dispatch regarding a vehicle, a dark green Crown Victoria, selling drugs at Valley Oaks Apartments. Officer Wilson's computer screen display supplied additional information from the call, including the name of the person who had made the call and their contact information. Officer Wilson remarked that this information was included so that she can contact the caller for further information, if need be. Officer Wilson was familiar with the Valley Oaks Apartments. She responded to calls their often, and she agreed that the area could be described as an area of high crime with drug-trafficking.

Officer Wilson stated that after receiving the call she was traveling east on Valley View Road toward White Oak Circle.[2] Officer Wilson stated that she was going to pull into a side street and walk into the apartment complex, but she saw a dark-colored Crown Victoria leaving the apartment complex as she approached. Officer Wilson turned her cruiser around to follow the Crown Victoria, as it headed west. During the time it took to turn around, a small sedan got in between Officer Wilson's cruiser and the Crown Victoria. Officer Wilson explained that the Crown Victoria stopped

---

[2]The Court admitted a map of the area of the stop from Google maps as **Exhibit 2**. Officer Wilson reviewed this map and stated that she recognized the map as the area of the stop.

at a three-way stop and made a left turn without signaling.³ The small sedan was between the cruiser and the Crown Victoria as Officer Wilson's cruiser approached the intersection. The sedan had its right turn signal on, and it turned right. Officer Wilson then approached the intersection and turned left.

Officer Wilson explained that making a turn without a signal is not necessarily a violation under Tennessee law, but it is a violation where it would affect another vehicle. Officer Wilson testified that in this case the vehicle behind the Crown Victoria was affected because it "had no idea" what the Crown Victoria was going to do.

Officer Wilson testified that Officer Keith Lyon heard the dispatch about the call from Valley Oak Apartments, and he sent Officer Wilson a message to her cruiser about an email he had received regarding a Crown Victoria fitting the description given in the 911 call. Officer Wilson testified that she viewed the email before she initiated the stop.

At the hearing, Officer Wilson viewed a copy of the email that had originally been sent from Sergeant William Wilson to the officers who were assigned to properties owned or serviced by the Knox County Development Corporation, ("KCDC"), including Keith Lyon, on January 26, 2011. The email reports, "[S]omeone dealing from the below vehicle at Valley Oaks Apartments." It includes a photograph of a green Crown Victoria taken in January 2011, and includes an enlarged photograph of its license plate number. Officer Wilson testified that she confirmed the plate on the Crown Victoria in front of her, using this information, before she initiated the stop.

---

³Officer Wilson testified that she drives a Crown Victoria as her service vehicle. She stated that she would recognize the turn signal in a Crown Victoria, and she noted that the Defendant's Crown Victoria, which is older than her Crown Victoria, has a slightly different signal.

5

On cross-examination, Officer Wilson explained that the email in evidence was not originally sent to her. She confirmed that on the video recording of the stop, when other officers arrive, she can be heard saying that she did not get the email, but she explained that she meant she did not get the email when it was originally sent from Sgt. William Wilson, because she was not an officer assigned to KCDC properties. Officer Wilson confirmed that Officer Lyon[4] forwarded the email to her after hearing about the call on dispatch. Officer Wilson said she was sure that the forwarded message was still in her computer, but she was not asked to print it from her computer for the hearing. She confirmed that the "To: KCDC" line of the email in evidence was not her email address and did not include her email address. She also noted that the persons carbon-copied on the email from Sgt. Wilson were employees of the crime analysis unit. Officer Wilson admitted that the email was originally sent two days before the stop in the case and that the photograph of the Crown Victoria included in the email was taken two weeks before the stop.

On redirect examination, Officer Wilson confirmed that she received the same email that had been admitted into evidence, except that the email in evidence did not contain the forwarding information header that the email she received did.

Attorney Lomonaco showed Officer Wilson a print-off of information, which was not moved into evidence, on cross examination, and he asked whether this print-off looked like Officer Wilson's laptop screen in her cruiser. Officer Wilson responded that her screen did not look like the print-off, and she stated that she believed her screen provides additional information. She recalled her screen including the location, area, caller's name, their address and phone number, and the information they

---

[4]Officer Wilson noted that Officer Lyon, an officer assigned to KCDC, was involved in this stop.

6

provided – in this case, a dark green Crown Victoria dealing drugs called in by a person who had been advised to call police. Officer Wilson said she did not personally know the person who had called 911 in this case. On redirect examination, Officer Wilson confirmed that the print-off, which appeared to be a call log, contained the 911 caller's name and phone number, along with the description of the Crown Victoria. She also agreed that according to the log less than two minutes elapsed following the call and her response; she stated that this comported with her memory that it had taken her less than five minutes to get to the apartment complex.

Officer Wilson noted that the Valley Oak Apartments had been taken over by KCDC a few months before the incident. The complex was shut-down, cleaned, and reopened. Officer Wilson recalled a homicide call to the complex prior to the clean-up and stated that a shots-fired call would be the most severe call that she knew of being called in after the complex had been cleaned-up.

Officer Wilson testified that the Defendant's failure to use its tail light affected the sedan that was present because the sedan had to wait additional time. Officer Wilson agreed that the sedan would have to wait on the Crown Victoria to stop. Then, the sedan would come to the stop sign, and thereafter, the sedan could turn. She agreed that this process would take place regardless of whether the Defendant signaled while driving the Crown Victoria. On redirect examination, Officer Wilson confirmed that a left turn requires more time to execute than a right turn, but on recross examination, Officer Wilson admitted that a car inching forward into the lane, so that two vehicles were in a lane, would violate traffic laws. She maintained that using the signal "would give the other drive knowledge."

7

Case 3:11-cr-00062-TAV-CCS   Document 23   Filed 07/26/11   Page 7 of 18   PageID #: 81

C.  **The Video Recording from Officer Wilson's Cruiser**

The video recording[5] from Officer Wilson's cruiser shows the headlights of the Crown Victoria, as Officer Wilson drives on Valley View Road and approaches Kay Springs Road. After seeing the headlights, Officer Wilson turns her cruiser around. Officer Wilson approaches the three-way intersection, and the Crown Victoria can be seen turning left with the sedan behind it. The sedan between the Crown Victoria has its turn signal on, but it is not clear from the video whether the Crown Victoria does or not.[6] The Crown Victoria turns left to continue on Valley View Road. The small sedan turns right, and thereafter, Officer Wilson turns left to follow the Defendant down Valley View. Officer Wilson catches up to the Crown Victoria about three to four blocks later at a second three-way intersection. At that time, she turns on her lights and initiates a traffic stop.

III.  **APPLICABLE LAW**

The Defendant argues that Officer Wilson did not have probable cause or reasonable suspicion to stop his vehicle for a traffic violation nor did she have reasonable suspicion to conduct an investigatory stop. The Court will address each of the Defendant's arguments in turn.

---

[5]The Court admitted a compact disc containing the video recording from Officer Wilson's cruiser camera as **Exhibit 3**. Portions of this recording are filmed in background mode, in which the recording is made in real time but with fewer frames. Other portions are filmed in active mode, which starts when an officer turns on his or her microphone or lights and includes shots more frames.

[6]This inability to determine whether the headlight is on is due to the quality of the images in the background mood and the distance between the Crown Victoria and the cruiser. Officer Wilson testified that it did not have its turn signal on, and the Court found this testimony to be credible. The Defendant offered no testimony to contradict Officer Wilson's testimony.

**A.      Officer Wilson Lacked Reasonable Suspicion to Believe a Traffic Violation Occurred**

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. United States v. Ferguson, 8 F.3d 385, 388 (6th Cir. 1993). If "the officer has probable cause[] to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." Id. at 391.

As pointed out in the parties' briefs, the issue of whether probable cause standard or reasonable suspicion standard governs the legality of a traffic stop is an unsettled question in the Sixth Circuit. In United States v. Sanford, 476 F.3d 391, 394 (6th Cir. 2007), the Court of Appeals for the Sixth Circuit contemplated that the reasonable suspicion standard "should" govern, as the cited offense was a misdemeanor traffic offense. Id. at 395. The court did not, however, affirmatively conclude that the reasonable suspicion standard governed. It instead declined to resolve the conflict, because the officer met both standards of reasonable suspicion and probable cause. Id. In a more recent case, the Court of Appeals again identified the conflict while declining to resolve it. See United States v. Blair, 524 F.3d 740, 748 n. 2 (6th Cir.2008).

In United States v. Bias, No. 3:08-cr-52, 2008 WL 4683217 (E.D. Tenn. Oct. 20, 2008), the Court suggested that a stop for a misdemeanor traffic violation should be analyzed under the standard of reasonable suspicion rather than probable cause, id. (citing Gaddis v. Redford Twp., 364 F.3d 763, 770 (6th Cir. 2004)), but the Court declined to rule definitively where the Court of Appeals had declined to do so and where the officer had neither reasonable suspicion nor probable cause to

9

make the stop.

The Court of Appeals itself recently acknowledged that "'virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation,' this circuit has required probable cause to justify an investigatory stop for completed misdemeanor traffic violations." United States v. Simpson, 520 F.3d 531, 540 (6th Cir. 2008). The court in Simpson expressed "grave doubts" about the use of the probable cause standard in such cases, but because the court in Simpson was only a panel, it could not overrule prior precedent on the issue, including decisions from the Court of Appeals, sitting *en banc*. Thus, the issue remains unresolved. Id. at 540-41.

The alleged traffic violation in this case is a misdemeanor, see Tenn. Code Ann. § 55-8-103, and the Court will evaluate it pursuant to the reasonable suspicion standard because the Court finds that Officer Wilson had neither probable cause nor reasonable suspicion to believe that a traffic violation had been committed.

Officer Wilson stopped the Defendant based upon her belief that the Defendant violated state law by failing to signal his intention to turn left at a three-way stop. Two portions of the Tennessee Code Annotated address the use of turn signals, Tenn. Code Ann. §§ 55-8-142 and 55-8-143. Section 55-8-142 directs:

> No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in § 55-8-140, or turn a vehicle to enter a private road or driveway, or otherwise turn a vehicle from a direct course or move right or left upon a roadway, unless and until this movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner provided in §§ 55-8-143 and 55-8-144 in the event any other traffic *may be affected by this movement*.

10

Tenn. Code. Ann. § 55-8-142 (emphasis added). Section 55-8-143 directs:

> Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that that movement can be made in safety, and whenever the operation of any other vehicle may be *affected by such movement*, shall give a signal required in this section, plainly visible to the driver of the other vehicle of the intention to make such movement.

Tenn. Code. Ann. § 55-8-143(a) (emphasis added). Based upon these provisions, Tennessee state courts have held that "a turn signal is only required by law when another vehicle may be affected by the turn." State v. Gonzalez, 52 S.W.3d 90, 99 (Tenn. Crim. App. 2000).

Thus, the issue before the Court is whether Officer Wilson had a "particularized and objective basis for suspecting" the Defendant violated these laws, by failing to use a turn signal when another vehicle might be affected, see United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000). The Court finds that Officer Wilson did not have an objective basis for suspecting the Defendant committed a traffic violation because the Defendant's failure to signal did not affect another vehicle and under the circumstances described could not have affected any other driver. Regardless of whether the Defendant used his turn signal, the driver of the sedan behind him was required to wait until the Crown Victoria exited the intersection, then pull to the stopping line, stop and check traffic each way, and execute his own turn. While the Government and Officer Wilson argued that the sedan could have maneuvered its way closer to the intersection, the legality of this move is highly questionable, even if it is an oft employed means of saving a few seconds. Officer Wilson testified that it would be illegal to have two vehicles in the same lane, during such a maneuver.

The Government has cited the Court to Bias, in support of the proposition that probable causes exists to believe a turn signal "violation has occurred if 'other drivers were present on the

11

road or attempting to enter the road.'" This is not the holding of Bias. The quotation on which the Government relies is better understood in its full context. Judge Phillips explained:

> [T]he court does not agree with the government's contention that merely being in a commonly 'high traffic area during a high traffic time of day' satisfies the statutory requirement. Such an interpretation would tend to render meaningless the word "affected." Rather, the government must demonstrate that other drivers were present on the road or attempting to enter the road, not simply that there were people and vehicles in parking lots in the general vicinity.

Bias, No. 3:08-cr-52, 2008 WL 4683217 at *3.

The term "affect" is commonly know as influencing or changing some person, thing, or action, or as Black's Law Dictionary explains the term, "to influence in some way," Black's Law Dictionary (9th ed. 2009). In this case, the Government has not demonstrated that Officer Wilson observed facts that supported a reasonable suspicion that the sedan, following the Defendant's Crown Victoria, was or would have been influenced by the Defendant's failure to signal. The only possible effect was that this failure to signal prevented an illegal maneuver to advance to the stopping line, and the Court finds that this effect does not fall within the policy or scope of the statutes cited above.

Accordingly, the Court finds that Officer Wilson did not have reasonable suspicion to stop the Defendant's vehicle for violation of traffic laws based upon his failure to signal his intention to turn left, and the allegation of a traffic violation does not provide a lawful grounds for stopping the Defendant's vehicle.

**B.      Officer Wilson Had Reasonable Suspicion to Conduct a Terry Stop**

As stated above, the alleged traffic violation does not provide a lawful grounds for stopping the Defendant's vehicle. However, for the reasons stated below, the Court finds that the stop was

12

lawful because Officer Wilson had reasonable suspicion that crime was afoot, so as to support a lawful stop pursuant to Terry v. Ohio, 392 U.S. 1, 30 (1968).

Where an officer has a reasonable suspicion to believe that criminal activity is afoot, he or she may conduct a brief stop of persons or vehicles short of traditional arrest to investigate. See Terry v. Ohio, 392 U.S. 1, 30 (1968). This determination of reasonable suspicion is to be made "in light of the totality of the circumstances," United States v. Caruthers, 458 F.3d 459, 465 (6th Cir. 2006), and requires the officers to "have a particularized and objective basis for suspecting the particular person stopped of criminal activity," Hurst, 228 F.3d at 757.

The Court of Appeals for the Sixth Circuit recommends a two-part test to determine the legitimacy of an investigatory stop. See, e.g., United States v. Luqman, 522 F.3d 613, 616-17 (6th Cir. 2008); United States v. Davis, 430 F.3d 345 (6th Cir. 2005). First, a court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." Davis, 430 F.3d at 354 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993)). If the basis for the Terry stop was proper, then the Court must determine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Davis, 430 F.3d at 354 (quoting Garza, 10 F.3d at 1245).

The Court of Appeals for the Sixth Circuit has previously applied these guidelines for investigatory stops of vehicles and found that an officer, with knowledge of a distinct car description and observation of the vehicle in a location consistent with the allegation of criminal activity, has reasonable suspicion to stop the vehicle. See, e.g., Hurst, 228 F.3d 751. The Court of Appeals

13

recently addressed the propriety of an investigatory stop in a factually similar scenario, when reviewing a claim brought under 28 U.S.C. § 1983 in Neal v. Welton, 2011 WL 2559003 (6th Cir. June 28, 2011).

In Neal, the Court of Appeals described the facts of the case as follows:

> On April 25, 2008, in Overton County, Tennessee, Deputy Sheriff Kelly Hull and [Sheriff] W.B. Melton were riding together on patrol. Chief Deputy Frank Dial received a call reporting a person selling drugs from a blue car near Rickman, Tennessee, and relayed the report to Hull.
>
> At approximately 8:45 p.m., Hull and Melton patrolling near Rickman, spotted 'a blue Cadillac that matched the description of the vehicle for which [they] had been on the lookout.' Hull radioed the license plate number to the dispatcher for a check against the National Crime Information Center ('NCIC') database. The check indicated that the license plate was registered to a brown, Buick Riviera in Hamilton County, Tennessee, and that the license plate was expired. Hull activated his emergency lights to conduct an investigatory stop.

Id. at *1. Based upon these facts, the Court of Appeals found that the officers had reasonable suspicion to conduct a Terry stop. Id. at *6.

The court noted, "Hull stated that he and Melton observed a 'blue Cadillace that matched the description of the vehicle for which we had been on the lookout' near the alleged drug selling location,'" and found that under the court's prior precedent the information supported finding that the officers had reasonable suspicion. The court specifically noted its holding in United States v. Hurst, 228 F.3d 751 (6th Cir. 2000), wherein the court found that a law enforcement's spotting of a vehicle matching the description of a suspect vehicle, including the fact that the vehicle's grill was missing "not far" from the location of a burglary, supplied reasonable suspicion for a stop, id. at 755. In dicta, the court in Neal explained that an "exact match of the license plates between the vehicle

14

allegedly selling drugs and [the suspect's] vehicle certainly strengthens a finding of reasonable suspicion." Id., n. 6.

Though the Court recognizes that Neal is an unreported civil case, it represents the culmination of reported case law of the Sixth Circuit and its application to a strikingly similar set of facts. Accordingly, the Court of Appeals's analysis in Neal serves as strongly persuasive authority in the case now before the Court.

In this case, dispatch radioed out a message that a caller, who had supplied his name and phone number, reported a person was either doing or selling drugs at the Valley Oak Apartments, a specific location. Dispatch relayed, both orally and through the cruiser computer display, that the caller had reported that the suspected drug user and/or dealer was in a dark green, Crown Victoria. Officer Wilson knew not only the color and general body style of the car, she knew the precise model, a model with which she was very familiar since she herself drove a Crown Victoria as her service car. Moreover, Officer Wilson knew that the caller had provided this information to dispatch just minutes before she approached the scene, because she reached the apartment complex no more than five minutes after dispatch sent out its notification.

Thus, as Officer Wilson approached the Valley Oak Apartments, she knew that a call had come in just moments ago identifying a dark green Crown Victoria as being involved in drug activity at that very location, and as she closed in on the apartment complex, a dark colored Crown Victoria left the same complex. As indicated in Neal and Hurst, this information alone likely supplies reasonable suspicion sufficient to make an investigative stop, but before making the stop, Officer Wilson compared the license plate number on the Crown Victoria to a recent email tying the vehicle to drug-related activity. Based upon the totality of the circumstances, as identified above, Officer

15

Wilson had a particularized and objective basis for suspecting the persons stopped in the Crown Victoria were engaged in criminal activity.

The Defendant has attempted to chip-away at the strength of Officer Wilson's knowledge by citing the Court to Florida v. J.L., 529 U.S. 266 (2000), wherein the United States Supreme Court held that a tip that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," from an anonymous caller did not supply reasonable suspicion, id. at 268. The Court finds the holding in Florida v. J.L. to be distinguishable from the instant case. In Florida v. J.L., the police had only the "bare report of an unknown, unaccountable informant," id. at 271, who lacked the reliability of a source who had provided information through which he or she could "be held responsible if [their] allegations turn out to be fabricated," id. at 270.

The Court of Appeals for the Sixth Circuit recently discussed the holding in Florida v. J.L., the policy behind it, and the exceptions to it, explaining:

> The risk presented by an anonymous tip is that the police have no recourse when the tip is false and few grounds for verifying it. How can the police arrest someone for providing a false lead if they don't know who it is? And how can the police verify the bases for the tipster's knowledge if they don't know whom to ask? See Florida v. J.L., 529 U.S. at 270, 120 S.Ct. 1375; United States v. May, 399 F.3d 817, 824-25 (6th Cir.2005). But these cautionary considerations are just that: considerations. They do not establish an unbending requirement that the police may never rely on anonymous phone calls. See Gates, 462 U.S. at 230, 103 S.Ct. 2317.

United States v. McKnight, 385 Fed. App'x 547, 550 (6th Cir. 2010)

In this case, Knoxville Police Department dispatch and Officer Wilson had both a name and phone number of the informant in this case. They had avenues for recourse and holding the informant responsible. Though the Court will concede that the recourse was not as strong as it

16

would have been after having had a face-to-face encounter with the informant or when dealing with an informant with an ongoing relationship with officers, there was avenue for recourse. Moreover, the tip in this case did not stand alone. It was part of a totality of the circumstances that included the email from Officer Lyon containing a similar complaint of drug-related activity from the same vehicle. The Court has considered the holding in Florida v. J.L., but the Court finds that it does not support finding that Officer Wilson's stop was unlawful in this case.

In sum, the Court finds that the stop was lawful under Terry and its progeny. Officer Wilson lawfully stopped the Defendant's vehicle based upon reasonable suspicion that its occupants were in possession of drugs. The Defendant has not challenged the duration of the stop and has, therefore, waived such a challenge. Accordingly, the Court's analysis is complete. The Court finds that Officer Wilson made a lawful stop of the Defendant's vehicle.

17

Case 3:11-cr-00062-TAV-CCS   Document 23   Filed 07/26/11   Page 17 of 18   PageID #: 91

## IV. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds Officer Wilson made a lawful stop of the Defendant's vehicle pursuant to Terry v. Ohio, 392 U.S. 1 (1968). Therefore, the Court **RECOMMENDS**[5] that the Defendant's Motion to Suppress the Stop and Seizure **[Doc. 15]** be **DENIED**.

Respectfully Submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).